UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

JOSEPH RAPUANO-NOVELLA and DYLAN PACE

                    Plaintiffs,

    -against-

OUTPOST PINES INTERMEDIATE HOLDINGS I LLC,

OUTPOST PINES INTERMEDIATE HOLDINGS II, LLC

OUTPOST PINES LLC, PJ MCATEER and MARIO
PRIOLA, individually,


                   Defendants.


------------------------------------------------------------------------X

Civil Action No:

 **COMPLAINT**

**PLAINTIFF DEMANDS A
TRIAL BY JURY**

Plaintiffs Joseph Rapuano-Novella (hereinafter "Novella") and Dylan Pace (hereinafter "Pace"), by and through their Counsel, PAUL LIGGIERI, ESQ. of THE DEREK SMITH LAW GROUP, PLLC, hereby complain of Defendants, OUTPOST PINES INTERMEDIATE HOLDINGS I LLC, OUTPOST PINES INTERMEDIATE HOLDINGS II, LLC, OUTPOST PINES LLC, P.J MCATEER and MARIO PRIOLO individually, upon information and belief, as follows:

### PRELIMINARY STATEMENT

1. Plaintiffs Novella and Pace, complain pursuant to Title VII of the Civil Rights

   Act of 1964 as amended, 42 U.S.C § 2000e et. Seq. ("Title VII"), and pursuant

   to laws of the State of New York, based upon diversity and the supplemental

1

jurisdiction of this Court pursuant to *Gibb*, 38 U.S. 715 (1966) and 28 U.S.C. § 136, seeking declaratory and injunctive relief and damages to redress the injuries Plaintiffs suffered as a result of, *inter alia*, Defendants creating and maintaining a hostile work environment, and otherwise discriminating against the Plaintiffs in the form of sexual harassment, gender discrimination, wrongful termination, retaliation, and civil liability for criminal sexual acts, assault, gender discrimination and all other applicable laws.

2.  Plaintiffs Novella and Pace have suffered from Defendants' approval and tacit consent of Defendant Priola's actions. Defendants consent effectively gave approval to Defendant Priola's cavalier attitude towards sexually harassing and discriminating against the young Plaintiffs that were employees of the Defendants. Such behavior is abhorrent to the laws of New York and The Federal laws.

3.  Both Plaintiffs were hired by the Defendants to work as bartenders/cashiers/servers and general labor employees for the Defendants' Fire Island business establishments. Fire Island is a small island located off of the south shore of Long Island. Areas of the island such as The Pines, cater primarily to the LGBTQ community. Plaintiff Novella and Pace both identify openly as homosexual males. For the Plaintiffs, what was supposed to be a summer of fun transformed into a Sodom and Gomorrah of discriminatory and unlawful behavior in a campaign launched against the Plaintiffs.

4.  In or around the spring of 2016, the Plaintiffs interviewed for employee positions with the Defendants. The interview process for Plaintiff Novella was

2

quite unique as Plaintiff's interviewed kicked off with Defendant Priola demanding a shirtless photo of Plaintiff Novella. Moreover, as a condition of Plaintiff Pace's employment, Defendant Defendant Priola demanded that Plaintiff Pace go to the Defendant's hot tub. This was the introduction to employment, offered by the Defendants who initiated, condoned and even promoted such unlawful conduct, despite opposition from the Plaintiffs, and other similarly situated employees.

## JURISDICTION AND VENUE

5. Venue is proper in this District based upon the fact that the events which give rise to the claims asserted herein occurred within the Eastern District in the County of Suffolk.

6. This Court has supplemental jurisdiction over the state causes of action asserted in this action. *Gibb*, 38 U.S. 715 (1966) and 28 U.S.C. § 136.

7. On or about October 11, 2016, both Plaintiffs filed complaints with the Equal Employment Opportunity Commission ("EEOC"), which acknowledged receipt of Plaintiffs' EEOC Charges.

8. The EEOC mailed a Right to Sue Letter to Plaintiffs.

9. Plaintiffs have satisfied all administrative prerequisites and are filing this case within ninety (90) days of receiving his Right to Sue Letter.

## PARTIES

10. Plaintiff Pace is an individual man who is a resident of Brookhaven, New York which is located in Suffolk County, Long Island.

11. Plaintiff Novella is an individual man who is a resident of Los Angeles, California.

12. At all times material, Outpost Pines Intermediate Holdings I, II and Outpost Pines, LLC (hereinafter "Outpost Pines"),were and are foreign limited liability companies doing business pursuant to the laws of New York State with a number of  locations for the purpose of business transactions including a primary location at 36 Fire Island Blvd, Sayville, New York 11782

13. At all times material all Outpost Pines entities were joint employers over the Plaintiffs

14. At all times material, Defendant PJ McAteer, (Hereinafter referred to as "Defendant Mcteer"), was and is an individual residing in the State of New York.

15. At all times material, Defendant Mario Defendant Priola (hereinafter referred to as "Defendant Defendant Priola"), was and is an individual residing in the State of New York..

16. At all times material, Defendant McAteer was and is an owner of Outpost Pines, and is directly familiar with the allegations contained herein and either directly or tacitly consented to the unlawful discriminatory behavior perpetrated against both Plaintiffs.

17. At all times material, Defendant Priola was and is the Operations Manager for Outpost Pines

18. At all times material, Defendants McAteer and Defendant Priola possessed supervisory authority over the Plaintiffs.

19. At all times material, Defendants McAteer and Defendant Priola possessed the authority to: (i) hire and fire; (ii) create work schedules; (iii) direct all daily activities of Plaintiffs and other similarly situated employees of Defendants; and take any other tangible employment actions as deemed necessary..

20. The above list is not an exclusive list, as Defendant McAteer as owner, and Defendant Priola as Operations Manager, possessed the authority to control almost every tangential work activity of the Plaintiffs.

## MATERIAL FACTS-PLAINTIFF NOVELLA

21. On or about March 9, 2016, Plaintiff Novella interviewed for an employment position with the Defendants.

22. Defendants required Plaintiff Novella to provide shirtless photos along with his resume.

23. Upon information and belief, Defendant Owner McAteer knew and condoned of such interview requests made of prospective employees for his companies.

5

24. During a Skype interview, Defendants' Supervisor Priola ordered Plaintiff Novella to remove his shirt.

25. Plaintiff Novella did as he was instructed.

26. Defendants' Supervisor Priola told Plaintiff he was a "perfect fit" and immediately hired Plaintiff Novella.

27. It is now understood that Defendant Priola made Plaintiff Novella take his shirt off to see if Plaintiff Novella would sexual arouse him. It is further now understood that Defendant Priola saw Plaintiff Novella as a new opportunity to unlawfully sexually harass an employee.

28. Shortly after the Skype interview, Defendant Priola began to send Plaintiff Novella inappropriate sexual text messages.

29. On or about May 16, 2016, Plaintiff Novella arrived on Fire Island and commenced his employment as a waiter at "Blue Whale" which is a bar and restaurant operated by Defendants under the direct supervision and control of Defendants' McAteer and Priola.

30. In an attempt to further his predatory behavior, Defendant Priola showered Plaintiff Novella with compliments, advising him that he was handsome and intelligent.

31. Throughout Plaintiff Novella's employment with Defendants, Defendant Priola subjected Plaintiff to vulgar and inappropriate sexual questions and comments. Such comments and conduct included but are not limited to: (i) Asking Plaintiff Novella to stick his finger up his anus and take a picture of it for Defendant Priola's sexual enjoyment; (ii) Asking Plaintiff Novella, "Do

6

you have lots of sex?"; "Are you (Novella) "trouble" and in need of reprimanding?" (Implying sexual spanking or other sexual acts); (iii) Asking Plaintiff Novella to see a photograph of his buttocks and (iv) Multiple requests for Plaintiff Novella to sleep at his home.

32. Defendant Priola's forceful sexual advances and demands made Plaintiff Novella feel degraded and humiliated.

33. On or about May 17, 2016, Defendant Priola attempted to tongue kiss Plaintiff Novella.

34. Plaintiff Novella again strongly rejected Defendant Priola's unwanted and unlawful sexual advance.

35. On or about May 20, 2016, Defendant Priola requested that Plaintiff Novella step outside of the Defendants' restaurant. Upon complying with Defendant Priola's orders, he once more, attempted to force himself on Plaintiff Novella with a tongue kiss.

36. Again, Plaintiff Novella rejected Defendant Priola's unwelcomed and unlawful sexual advance.

37. Defendant Priola was extremely frustrated and upset because Plaintiff Novella declined Defendant Priola's intrusive sexual advances.

38. Defendant Priola asked Plaintiff Novella, "Playing hard to get? The summer is long, there's plenty of time for me to get in there." (implying entering Claimant's anus)

39. At or around that same time, Defendant Priola forcefully groped Plaintiff Novella's buttocks as he walked away.

7

40. Plaintiff Novella again declined Defendant Priola's sexual advance as he expressed that he was not interested in having a sexual relationship with Defendant Priola.

41. Defendant Priola's unwanted and unlawful sexual assault left Plaintiff Novella in shock and in fear.

42. Plaintiff Novella was appalled that a staff member - especially a top manager - would use such vulgar and sexually harassing behavior. Plaintiff Novella was severely distraught and the work environment was extremely hostile.

43. Defendant Priola became enraged at Plaintiff for rejecting his sexual advance and stormed out of the restaurant.

44. Throughout Plaintiff Novella's employment with Defendants, Defendant Priola inappropriately touched Plaintiff Novella on multiple occasions, at least 20 times.

45. Defendant Priola groped Plaintiff Novella's penis numerous times without consent.

46. Plaintiff Novella protested each time, but each time the Plaintiff protested, Defendant Priola became more aggressive.

47. In fact, Plaintiff Novella was advised by a staff member, Hunter, that Defendant Priola "does this to everyone" and has a history of sexual harassment/assault on the island.

48. On or about May 27, 2016, Plaintiff Novella was at the gym. Defendant Priola stood behind Plaintiff Novella, sniffed Plaintiff Novella's arm pit and told him, "I like my men sweaty."

8

49. On or about May 29, 2016, Defendant Priola asked Plaintiff Novella if he enjoyed rough sex. Plaintiff Novella responded, "You'll never know" and again rejected Defendant Priola's sexual advance.

50. In retaliation for complaining about the unwelcomed sexual conduct and contact, Defendant Priola assaulted Plaintiff Novella and slapped Plaintiff Novella across the face and laughed.

51. Plaintiff Novella then explicitly told Defendant Priola, "You will never touch me like that again!" Defendant Priola responded, "That just gave me a chubby [erection]."

52. Plaintiff Novella was again disgusted and more important, saddened by the fact that his complaints of sexual harassment and assault fell on deaf ears. Defendant Priola was relentless and simply would not listen to Plaintiff Novella's protected complaints.

53. On or about June 6, 2016, Plaintiff Novella complained to Defendants' Human Resources ("HR") of the horrific sexual harassment he endured from Defendant Priola.

54. Defendants' HR Director/Representative Sullivan admitted to Plaintiff Novella, that Defendant Priola had a history of hiring men with whom he was sexually involved; or to whom he was sexually attracted. Rather than take appropriate action to protect Plaintiff (i.e. launch an investigation or advise Defendant Priola to cease his unlawful conduct), Sullivan encouraged Plaintiff Novella to go out for drinks with Defendant Priola.  Human Resources advised the Plaintiff to do this even though they were fully aware of Plaintiff

Novella's protected complaints as well as Defendant Priola's propensity for sexual harassment in the workplace.

55. Defendants' employee Sullivan aided and abetted in Defendant Priola's discriminatory conduct.

56. At or around this same time period, Defendant Priola observed Plaintiff Novella and Plaintiff Pace spending time together. Becoming intensely jealous and aggressive, Defendant Priola interrogated Plaintiff Novella on three separate occasions about the status of his relationship with Plaintiff Pace.

57. Defendant Priola then expressed his romantic/sexual interest in Plaintiff Pace and ordered Plaintiff Novella not to be seen with Plaintiff Pace at the resort otherwise there would be consequences to Plaintiff Novella's employment.

58. Defendant Priola was intensely aggressive towards both Plaintiffs when he discovered they were romantically involved. Defendant Priola lashed out with anger and physical acts by responding rudely, yelling at the Plaintiffs, and slamming doors in or around the Plaintiffs.

59. On or about June 10, 2016, for the first time, Plaintiff Novella was a few minutes late for his shift. Defendant Priola furiously berated Plaintiff Novella and shouted "Were you busy sucking Dylan's (Plaintiff Pace) big fat cock?"

60. Defendant Priola told Plaintiff Novella that he should go out on a date with him, and that Plaintiff Pace was also going on a date with Defendant Priola so Novella should do as ordered.

61. Defendant Priola sexually harassed Plaintiff Novella and attempted to force Plaintiff Novella into *quid pro quo* sexual harassment.

10

62. Defendants discriminated against Plaintiff Novella on the basis of his gender qualities. Defendants further subjected Plaintiff Novella to sexual harassment and a hostile work environment based on his gender qualities and sexual orientation.

63. Later that day, on or about June 10, 2016, Plaintiff Novella noticed his paycheck was less than usual.

64. When approached with the discrepancy in Plaintiff Novella's paycheck, Defendant Priola refused to review Plaintiff Novella's hours.

65. Defendant Priola again retaliated against Plaintiff Novella because Plaintiff declined his sexual advances and complained to both Priola and Human Resources about sexual harassment.

66. Defendant Priola subjected Plaintiff Novella to an adverse employment action by reducing his hours and ultimately constructively terminating him.

67. On or about June 12, 2016, Defendant Priola demanded to know certain information regarding Plaintiff Novella's sexual relationship with Plaintiff Pace. Plaintiff Novella refused to disclose any information regarding his relationship with Plaintiff Pace despite Priola's aggressive demands.

68. Defendant Priola quickly became frustrated and called Plaintiff Novella a "Pussy" (in further discrimination against the Plaintiff on account of his gender qualities) and told him, "Both of you can go fuck yourselves!"

69. Before going separate ways, Defendant Priola told Plaintiff Novella, "If you ever want to be dominated, the code to my house is 1023."

11

70. Plaintiff Novella took this to be a threat to fight or be sexually assaulted and therefore told Defendant Priola to stop the persistent unlawful conduct.

71. Later that night, Plaintiff Novella went to a bar with Plaintiff Pace.

72. Upon information and belief, Defendant Priola stalked the Plaintiffs in furtherance of his devious sexual desires and in retaliation for Plaintiffs' protected complaints. In fact, Defendant Priola appeared at the bar that Plaintiffs went to and lurked beside Plaintiff Novella and Plaintiff Pace the whole night.

73. On or around June 16, 2016, a meeting was held with around twenty employees. Plaintiffs overheard other employees' comments regarding Defendant Priola's sexual interest in Plaintiff Novella and Plaintiff Pace. The term "love triangle" was used repeatedly by the staff members while talking about the sexual harassment to which Claimants were being subjected.

74. On or about June 18, 2016, Plaintiff Novella encountered difficulties in his romantic relationship with Plaintiff Pace. Defendant Priola quickly discovered the news and Defendant Priola intensified the sexual advances towards Plaintiff Novella.

75. On or about June 21, 2016, Defendant Priola told Plaintiff Novella to meet with him.

76. On or about June 22, 2016, Defendant Priola agreed to speak to Plaintiff Novella regarding the discrepancy in Plaintiff Novella's paycheck from two weeks prior.

12

77. Defendant Priola admitted to Plaintiff Novella that he diminished Plaintiff Novella's pay check from sixty-four hours to forty hours, denying him overtime. The paycheck was diminished in retaliation against Plaintiff Novella.

78. Defendant Priola made modifications and $172.49 was deposited into Plaintiff Novella's account two days later.

79. Later that day, Plaintiff Novella had dinner with Defendant Priola after being ordered to do so. Throughout the night, Defendant Priola was pushing alcohol and Xanax on the Plaintiff. Defendant Priola insisted that Plaintiff Novella come over to his home and spend the night but specified that nothing sexual was going to happen. Defendant Priola was clearly manipulating the much younger Plaintiff Novella.

80. Once arriving at Defendant Priola's home, Defendant Priola told Plaintiff Novella that they must sleep without clothes on. Plaintiff Novella refused and slept with his clothes on.

81. The following morning, Defendant Priola attempted to have sexual intercourse with Plaintiff Novella.

82. During the morning, Defendant Priola began rubbing Claimant's penis while Plaintiff slept.

83. Plaintiff moved away from Defendant Priola but Defendant Priola kept moving closer to him.

84. Undeterred, Defendant Priola starting grinding his erect penis against the back of Plaintiff Novella.

85. Defendant Priola asked Plaintiff if he was on any anti-HIV medication.

86. Plaintiff replied, "No."  Defendant Priola asked Plaintiff to take anti-HIV medication so that they could have sexual intercourse.

87. Defendant Priola had attempted multiple times to sleep with Plaintiff Novella without telling the Plaintiff he was positive for HIV.

88. After Plaintiff rebuffed his offer for sexual intercourse, Defendant Priola stated that they could do other sexual stuff that not would put Plaintiff at risk for infection.

89. Again, Plaintiff adamantly Defendant Priola's sexual advance.

90. Defendant Priola noticed that Plaintiff was anxious and asked him if he wanted a Xanax.

91. Plaintiff refused Defendant Priola's offer of Xanax and left Defendant Priola's home.

92. On or about June 24, 2016, Defendant Priola rushed into Plaintiff Novella's workplace yelling at Plaintiff Novella. Defendant Priola told Plaintiff Novella that he would be extremely angry and there would be consequences if he discovered that Plaintiff Novella was still romantically involved with Plaintiff Pace.

93. Once more, Defendant Priola made aggressive sexual advances toward Plaintiff Novella.

94. Again, Plaintiff Novella declined Defendant Priola's aggressive sexual advances.

14

95. Due to anxiety, Plaintiff Novella became extremely ill and asked Defendants'
Human Resource Director, Sullivan, if he could be excused for the day on
account of Defendant Priola's devious behavior.

96. As Plaintiff Novella walked home, he received a call from Defendant Priola
demanding he come into the Defendants' office.

97. Once Plaintiff Novella arrived at Defendant Priola's office, Defendant Priola
accused Plaintiff Novella of malingering. Defendant Priola discriminated
against Plaintiff's gender and called Plaintiff Novella a "Pussy." Defendant
Priola further demanded that he return to work. Plaintiff Novella expressed he
was suffering from panic attacks and anxiety on account of Defendant Priola's
unlawful and egregious retaliatory and discriminatory behavior.

98. Plaintiff Novella went home extremely ill and distraught. Plaintiff Novella
spent hours vomiting due to anxiety and intense panic attacks caused by the
sexual harassment by Defendants.

99. On or about June 28, 2016, Plaintiff Novella left Fire Island to seek medical
attention at an urgent care facility. Plaintiff Novella was diagnosed with strep
throat.

100.   Plaintiff Novella sent Defendant Priola a message advising him of his
illness and that he would be unable to attend work that evening.

101.   Once Plaintiff Novella returned to Fire Island, Defendant Priola witnessed
Plaintiff Novella and Plaintiff Pace walking together. Defendant Priola was
extremely upset because he felt like he owned Plaintiff Novella since he could
easily manipulate a younger employee that was his subordinate.

15

102.    In retaliation, Defendant Priola sent Plaintiff Novella a message stating he did not technically grant Plaintiff Novella the day off.

103.    Plaintiff Novella contacted Human Resource Director, Sullivan, to discuss the ongoing sexual harassment and retaliation that Defendant Priola subjected the Plaintiff to.

104.    Sullivan informed Defendant Priola that Plaintiff Novella requested to speak with him.

105.    Defendant Priola contacted Plaintiff Novella and demanded that he no longer contact Sullivan so as to dissuade the Plaintiff from making protected complaints.

106.    On or about July 5, 2016, Plaintiff Novella disclosed to Defendant Priola that he was not making enough money to support himself.

107.    Defendant Priola offered to pay Plaintiff Novella two hundred dollars ($200.00) if Plaintiff Novella would provide Defendant Priola with a private yoga class. Plaintiff Novella scheduled a yoga session on the beach later that afternoon.

108.    Defendant Priola met Plaintiff Novella on the beach for approximately one hour. At the end of the hour, Defendant Priola invited Plaintiff Novella to dinner with Sullivan, Sullivan's boyfriend and other employees. Defendant Priola suggested that Plaintiff Novella attend the dinner to discuss options on not paying for housing.

109.    Later that evening, Plaintiff Novella showed up to the restaurant. However, much to the shock and dismay of Plaintiff Novella, Defendant

16

Priola had purposefully and unlawfully lured the Plaintiff into a private dinner.

110.    Throughout dinner, Defendant Priola engaged in bouts of *quid pro quo* sexual harassment with the substantially younger Plaintiff. In fact, Defendant Priola offered Plaintiff Novella free housing only if Plaintiff Novella slept in Defendant Priola's home and did his laundry.

111.    Defendant Priola's unsolicited request for sex in exchange for free housing humiliated Plaintiff Novella.

112.    Plaintiff Novella was visibly uncomfortable and insisted they return to Fire Island Pines.

113.    As Plaintiff Novella and Defendant Priola walked back, Defendant Priola attempted to make out with Plaintiff Novella twice.

114.    Defendant Priola expressed to Plaintiff Novella that he wanted to have sex with Plaintiff Novella on the docks. Defendant Priola implored Plaintiff Novella to sleep at his home.

115.    Once again, Plaintiff Novella declined the invitation and told Defendant Priola that his advances were still unwelcome.

116.    Defendant Priola became frustrated with Plaintiff Novella and left.

117.    Plaintiff Novella was unable to sleep the rest of the night due to the sexual harassment.

118.    On or about July 6, 2016, Plaintiff Novella again expressed his objection to Defendant Priola and further stated that he wanted to maintain a strictly professional relationship with him.

17

119.    In direct response to Plaintiff Novella's objection, Defendant Priola was infuriated and began to scream at Plaintiff Novella. Defendant Priola then advised Plaintiff Novella that he (Novella) was "under the umbrella of [Mario Priola's] protection" and that he had the power to protect his job or to not protect his job. Defendant Priola informed Plaintiff Novella that he prevented Plaintiff Novella from being reprimanded by the company owner and human resource director.

120.    The above not so indirect threats from Defendant Priola left Plaintiff Novella in a state of depression and feeling like further complaints would be futile.

121.    On or about July 7, 2016, Plaintiff Novella informed Defendant Priola that he was suffering from a high fever. Defendant Priola told Plaintiff Novella to stop malingering, and that he could make more money as his personal assistant.

122.    On or about July 9, 2016, Defendant Priola told Plaintiff Novella "If you really want more money, stay clocked in tonight." Plaintiff Novella did as instructed.

123.    Defendant Priola then told Plaintiff Novella , "If you want more hours, go lay with Liv (Defendant Priola's dog)." Plaintiff Novella spent a few hours at Defendant Priola's home for the night. Once Defendant Priola fell asleep, Plaintiff Novella left Defendant Priola's home due to high anxiety.

124.    On or about July 11, 2016, Plaintiff Novella went to Defendant Priola's home for work-related duties (retrieving employee t-shirts kept at Priola's place of residence) before Defendant Priola went on vacation for a week.

125.    When Plaintiff Novella arrived at Defendant Priola's home, Defendant Priola was naked on his bed, ordering Plaintiff Novella to have sex with him.

126.    Plaintiff Novella again declined Defendant Priola's sexual advances.

127.    Defendant Priola threatened to retaliate against Plaintiff Novella for not complying with his unlawful sexual demands for intercourse. Defendant Priola told Plaintiff Novella that he might as well take the ferry and not come back to work.

128.    On or about July 15, 2016, Plaintiff Novella was desperate to put an end to the extreme sexual harassment of Defendant Priola. Plaintiff Novella sent a text message to Sullivan requesting a meeting.

129.    Sullivan contacted Defendant Priola to inform him that Plaintiff Novella requested a meeting.

130.    Defendant Priola contacted Plaintiff Novella to investigate why Plaintiff Novella wanted to meet with Sullivan and to deter Plaintiff Novella from meeting with anyone in HR.

131.    Defendant Priola contacted Defendant McAteer, Defendants' owner, to intervene in the meeting in the hopes of thwarting any efforts to reveal his unlawful predatory behavior. Defendant Priola and Defendant McAteer lived in the same residence and had an allegiance to each other.

132.   Plaintiff Novella informed and complained to Defendant McAteer and HR Director Sullivan that he could no longer withstand the relentless sexual harassment from Defendant Priola or the overall unlawful environment.

133.   Plaintiff Novella also told them that Defendant Priola modified paychecks, paying Plaintiff for hours he did not work. Defendant McAteer and Sullivan admitted to Plaintiff Novella that they were aware of the ongoing sexual harassment by Defendant Priola.

134.   Even more telling was that Defendants own HR Director Sullivan, was aware of Defendant Priola's history of sexual harassment. Instead of taking Plaintiff Novella seriously, Sullivan told Novella "that's just Mario [Priola]."

135.   Defendants failed to comply with any internal procedures regarding sexual harassment and discrimination. Defendants failed to launch any investigation into Plaintiff Novella's complaints. Defendants failed to institute any preventative measures so as to ensure that Defendant Priola was unable to sexually harass Plaintiff Novella. Defendants failed to take action against Defendant Priola for his discriminatory behavior.

136.   On or about July 17, 2016, Defendant Priola returned from vacation and requested Plaintiff Novella to sleep over his house.

137.   Plaintiff Novella declined Defendant Priola's sexually harassing request and was flabbergasted that Defendant Priola would again make such a request in the wake of Plaintiff's complaints to HR and ownership. Defendant Priola became agitated and yelled, "I thought you were going to be a 5-year employee!"

138.    The above comment represents one of many instances in which Defendant
Priola threatened Plaintiff Novella's job if Plaintiff Novella refused to engage
in sexual acts and/or go to Defendant Priola's home.

139.    On or about July 18, 2016, Defendant Priola verbally assaulted both
Plaintiffs by stalking them to their destination at exclaiming that "[Plaintiffs]
better not be seen together or else." Plaintiff Novella expressed to Defendant
Priola that he was tired of being manipulated.

140.    Strangely, Defendant Priola started to cry profusely and begged for
Plaintiffs not to sue him, despite the fact that Plaintiffs never indicated at any
time that they intended to sue Defendant Priola. After breaking down,
Defendant Priola did not disturb Plaintiffs for the rest of the day.

141.    On or about July 19, 2016, Plaintiff Novella met with Defendant Owner,
McAteer to once again discuss the unbearable sexual harassment and hostile
work environment  he was enduring under the supervision of Defendant Priola
as well as all Defendants.

142.    First, Plaintiff Novella complained about the ongoing sexual harassment
by Defendant Priola. Second, Plaintiff Novella advised Defendant McAteer
about the lack of professionalism and the hostile work environment created on
the island. Specifically, Plaintiff Novella advised Defendant McAteer that he
was uncomfortable with Defendants ordering him to promote explicit and
arguably illegal, live sex shows. Plaintiff Novella explained that these live sex
shows promoted a hostile work environment as well as prostitution on the
island.



144.    The above is just one of many images depicting the live sex shows, hosted

by Defendants' company, in which Defendants forced the Plaintiffs to

promote such shows.

145.    Defendant McAteer dismissed Plaintiff Novella's protected complaints on

account of gender and sexual harassment. Defendant McAteer negligently

responded, "I can't do this without Mario."

146.    Moreover, Defendant McAteer told Plaintiff Novella that he should refrain from complaining on account of his protected status because Plaintiff Novella was there "to do a job."

147.    Upon information and belief, Defendant McAteer and Defendants' HR Director Sullivan, did nothing to investigate the protected complaints. Instead, they only advised Defendant Priola of the allegations and condoned his behavior by doing nothing about it.

148.    Later that night, Defendant Priola confronted Plaintiff Novella in his room and asked if Plaintiff Novella had intentions on suing for sexual harassment. Defendant Priola begged Plaintiff Novella to sign a contract expressing that their exchanges were mutual. Plaintiff Novella refused Defendant Priola's attempts to conceal his sexually harassing and discriminatory behavior. .

149.    Defendant Priola rushed to Plaintiff Pace's workplace to ask Plaintiff Pace to sign the contract. Plaintiff Pace refused.

150.    At or around this same time period, Defendant Priola also told Plaintiff Novella that Plaintiff Novella should take a few days off as a vacation reward, so long as he took the time off to think about why the Plaintiff should not file any additional complaints of sexual harassment.

151.    Plaintiff Novella was shocked that Defendant Priola would offer the Plaintiff time off as a payoff for staying silent with regard to any sexual harassment or assault perpetrated by the Defendant.

152.    On or around July 19 2016, Defendants constructively discharged Plaintiff Novella by making his conditions at work unbearable. Due to the sexual harassment, Plaintiff Novella was compelled to leave his job due by way of constructive discharge.

153.    As a result of the Defendants' actions, Plaintiff Novella suffered and continues to suffer from extreme emotional distress.

**MATERIAL FACTS-PLAINTIFF PACE**

154.    On or about May 16, 2016, Plaintiff Pace commenced his employment with Defendants as a cashier at Pines Pizza.

155.    Pines Pizza is owned Defendant McAteer and in fact his office was immediately next door to his pizza restaurant.

156.    Defendant McAteer shared a home with Defendant Priola and was aware of Defendant Priola's propensity for sexually harassing and sexually assaulting the employees of Defendants.

157.    On Plaintiff Pace's first day of work, Defendant Priola created a severe and hostile work environment by exclaiming that Plaintiff Pace was "hot" in front of all the Plaintiff's co-workers.

158.    Plaintiff Pace was uncomfortable with Defendant Priola's inappropriate remarks and in fact made this known to Defendant Priola.

159.    During Plaintiff Pace's first shift, Defendant Priola requested that Plaintiff Pace meet him outside of work.

24

160.   On Plaintiff Pace's second day of work, Defendant Priola approached Plaintiff Pace from behind, leaned in and tried to kiss Plaintiff Pace directly on the lips.

161.   Plaintiff Pace expressed discomfort with Defendant Priola's inappropriate and unlawful behavior.

162.   On or about May 17, 2016, Defendant Priola ordered Plaintiff Pace as his employee to go to his house, advising the Plaintiff that he was having people over.

163.   Upon arriving at Defendant Priola's house, Defendant Priola ordered Plaintiff Pace to go over to Defendant's hot tub. Plaintiff complied with his supervisor's order.

164.   Once Plaintiff Pace arrived at the hot tub, he noticed that the hot tub was not functioning. Defendant Priola then ran over to Plaintiff Pace, acknowledged that the hot tub did not function and further told Plaintiff Pace that no other guests would be coming over.

165.   Defendant Priola then ordered Plaintiff Pace to go to his room and comply with the Defendant's house employee rules which Defendant Priola advised Plaintiff Pace meant he had to strip down naked.

166.   Plaintiff Pace expressed discomfort to Defendant Priola and directly advised him that he was uncomfortable with Priola's sexually harassing, unprofessional and inappropriate behavior.

167.   Defendant Priola did not care. Instead, Defendant Priola again chirped "You must be naked in my room." Plaintiff Pace, fearful of being

25

insubordinate and sensing he might lose his job, complied with Defendant Priola's unprofessional and unlawful request.

168.    After complying with Defendant Priola's request, the Defendant, who was more than double the age of the Plaintiff, demanded that Plaintiff Pace sleep in his home. Plaintiff Pace complied with his supervisor's orders despite protest. No sexual intercourse took place despite aggressive sexually harassing behavior from Defendant Priola.

169.    The next morning when  Plaintiff Pace woke and departed for work, Defendant Priola advised the Plaintiff that when "[Plaintiff Pace's] leg accidentally brushed" near Defendant Priola's leg during the interview process, Plaintiff Pace gave Defendant Priola "a boner (an erection)."

170.    While Plaintiff Pace worked assiduously during the day at Pines Pizza to complete each work task, Priola stalked and lurked over Plaintiff Pace.

171.    Plaintiff Pace asked whether Defendant Priola could speak to Defendant Owner McAteer about his working hours and work accommodations because Plaintiff Pace was uncomfortable working with Defendant Priola but needed additional working hours to assist with his finances..

172.    Defendant Priola then advised Plaintiff Pace that he would give Plaintiff Pace more working hours on the condition that Plaintiff Pace spent more time with Defendant Priola. In other words, Defendant Priola was looking for a way to use his power as a much older supervisor in an effort to sexually harass Plaintiff Pace.

173.    Plaintiff Pace did not accept Defendant Priola's *quid pro quo* sexual harassment despite Defendant Priola's numerous and unlawful attempts to get the Plaintiff to play along.

174.    In fact, Defendant Priola would often tell Plaintiff Pace in front of other employees that there were "perks to dating a boss."

175.    Plaintiff Pace was disgusted at Defendant Priola's remarks and did not appreciate the fact that Defendant Priola had the audacity to make such sexually harassing remarks in front of co-workers who witnessed and demeaned the Plaintiff on account of hearing such commentary. Such remarks made in front of co-workers only fueled the severe and pervasive hostile work environment.

176.    On or about May 24, 2016, Priola lurked at Pines Pizza for Plaintiff Pace throughout the entire shift. Throughout the whole day, Priola sexually harassed and groped Pace despite protest.

177.    On or about May 25, 2016, Plaintiff Pace developed a romantic relationship with Plaintiff Novella.

178.    Plaintiff Pace confided in Plaintiff Novella and shared that he was being subjected to unbearable sexual harassment and assaults by Priola.

179.    Plaintiff Novella and Plaintiff Pace were deeply disturbed by their supervisor's unsolicited and unwelcome sexual behavior.

180.    Plaintiff Novella was shocked by the information Plaintiff Pace shared with him since it seemed that the *modus operandi* of Defendant Priola was to sexually harass and assault his younger male employees.

181.     On or about May 28, 2016, Plaintiff Pace sent a text message to Defendant

Priola and informed him that he did not receive a direct deposit despite the

fact that Defendants' policy dictated that employees be paid on time.

182.     Defendant Priola responded to the Plaintiff by asking "Why, do you need

money?" Immediately thereafter Defendant Priola solicited sex from Plaintiff

Pace and asked whether Plaintiff Pace wanted to sleep in bed.

183.     Plaintiff Pace did not accept Defendant Priola's unsolicited and

unwelcomed sexual offer even though Defendant Priola used his authority as

the Plaintiff's supervisor to solicit such sexual request.

184.     On or about May 29, 2016, Defendant Priola ordered Plaintiff Pace to

sleep at his home.

185.     Plaintiff Pace, trying to keep his new job, spent the night at Defendant

Priola's home but did not engage in any sexual activity despite his

supervisor's unsolicited and unwelcomed requests.

186.     On or about May 31, 2016, Defendant Priola went to Plaintiff Pace's

workplace to demand that Plaintiff Pace make him a "sandwich." Defendant

Priola then immediately left Plaintiff Pace's workplace. Plaintiff Pace was

perplexed by Defendant Priola's request.

187.     While on duty, Plaintiff Pace texted Defendant Priola, inquiring what type

of sandwich the Plaintiff should make for the Defendant, since the restaurant

made a number of different sandwiches.

188.     Defendant Priola responded to Plaintiff Pace by advising him that he

wanted a "booty sandwich."

28

189.    The above request made by Defendant Priola was a request for unsolicited

and unwanted sexual acts. Plaintiff Pace was in shock and dismay over

Defendant Priola's complete disregard for any sense of professionalism.

190.    On or about June 3, 2016, while lurking over Plaintiff Pace, Defendant

Priola observed that Plaintiff Pace's cell phone screen was shattered. Upon

noticing the screen, Defendant Priola took two new i phones from the

Defendants' Lost & Found and told Plaintiff Pace to take them.

191.    After handing Plaintiff Pace the phones, Defendant Priola told Plaintiff

Pace "Someone better get laid soon." Defendant Priola was ordering Plaintiff

Pace to take the phones in exchange for sexual acts.

192.    Defendant Priola's manipulative and forward sexual attacks made Plaintiff

Pace extremely uncomfortable and left the Plaintiff in severe emotional

distress.

193.    Defendant Priola consistently solicited sex from the Plaintiff even though

(i) Plaintiff Pace had complained to Defendant Priola as his supervisor that he

had no sexual interest in the Defendant; (ii) was half the age of the Defendant;

(iii) Plaintiff Pace rejected multiple requests for sex from Defendant Priola

and (iv) Defendant Priola was in a position of power of Plaintiff Pace.

194.    At or around this same time period, on one particular occasion, Defendant

asked Plaintiff Pace "Do I have to beg" for sex?

195.    Plaintiff Pace never responded to Defendant Priola's outlandish and

inappropriate request for a sexual favor which only served to exacerbate

Plaintiff Pace's anxiety.

196.    In or around June, 2016, a few days after Defendant Priola's outlandish request, Defendant Priola requested that Plaintiff Pace attend a meeting at his office. At the meeting, Defendant Priola gave Plaintiff Pace a $1.00 hourly raise and added four extra hours to Plaintiff Pace's paycheck for the week. Plaintiff Pace did not work for these for hours, but Defendant Priola made it clear that he was adding extra hours to Plaintiff Pace's paycheck as a heightened attempt to convince Plaintiff Pace to have sex with Defendant Priola.

197.    Plaintiff Pace was deeply disturbed by his supervisor's unsolicited request for sex in exchange for money.

198.    On or about June 6, 2016, Defendant Priola sent a photo to Plaintiff Pace's Facebook account. The photo depicted both Plaintiffs with a heart drawn around it.

199.    Upon information and belief, Defendant Priola sent the above message on account of pure jealousy because Plaintiff Novella and Pace were in a relationship and the both of them had rejected unlawful sexual advances from Defendant Priola.

200.    At or around this same time, Defendant Priola offered Plaintiff Pace a cash advance to pay off bills for the Plaintiff, presumably so Plaintiff Pace would engage in unwanted sexual intercourse with Defendant Priola.

201.    On or about June 10, 2016, Plaintiff Pace became so distressed by the sexual harassment and hostile work environment perpetrated by Defendant Priola, that his psoriasis medical condition flared up.

30

202.    In fact, Plaintiff Pace's arms, chest, head, groin and legs were covered with rashes as a result of Defendant Priola's actions. As the sexual harassment progressed and intensified, so too did Plaintiff Pace's medical condition.

203.    From on or about June 10th to on or about June 13th, 2016, Defendant Priola repeatedly implored Plaintiff Pace to sleep over Defendant Priola's house for the purpose of having sexual intercourse. Plaintiff Pace declined Defendant Priola's invitations of sexual harassment.

204.    On or about June 17, 2016, Defendant Priola again begged Plaintiff Pace to sleep over his house several times. Plaintiff Pace again declined Defendant Priola's unwelcomed sexual advances.

205.    On or about July 4, 2016, Defendant Priola sent Plaintiff Pace a text message in which he asked to perform oral sex on Plaintiff Pace.

206.    Defendant Priola's sexually harassing and discriminatory behavior continued to intensify even though Plaintiff Pace denied Defendant Priola's requests.

207.    Plaintiff Pace was fearful and stressed because he believed Defendant Priola would terminate him for not complying with his unwanted sexual demands.

208.    In or around this same time period, Defendant Priola went on vacation. While Defendant Priola was on vacation, Plaintiff Pace mistakenly undercharged a guest and Defendants required Plaintiff Pace to pay a total of $69.41 for his error.

209.    Defendant Priola was informed of Plaintiff Pace's error and gave Plaintiff

Pace $70.00 from his personal bank account. Upon information and belief, the

deposited money from Defendant Priola was once again a solicitation of

unwanted sexual favors from Plaintiff Pace.

210.    Defendant Priola called Plaintiff Pace and stated that Defendant McAteer

would be meeting with Plaintiff Pace to give him a raise. Defendant Priola

stated on the phone call "There are perks to being with a boss." Immediately

thereafter, Defendant Priola asked Plaintiff Pace to go for drinks with him.

Plaintiff Pace declined Defendant Priola's sexual advances.

211.    The Defendants, under the leadership of Defendant McAteer, who was

aware of Defendant Priola's unlawful actions, took no disciplinary actions

against Defendant Priola whatsoever

212.    Due to economic hardship, Plaintiff Pace continued to work in the severe

and pervasive hostile work environment perpetrated and condoned by the

Defendants.

213.    Plaintiff Pace complained to Defendants Director of Human Resources,

Kenny Sullivan, regarding the ongoing sexual harassment and discrimination

conducted by Defendant Priola.

214.    Upon complaining to Sullivan, Plaintiff Pace was advised that "this place

(Defendant McAteer's establishments) is not real life" and to "not think too

much about it because we will all leave here soon."

215.    Acknowledging wrong doing, at or around this same time period,

Defendant Priola encouraged Plaintiff Pace to speak with Plaintiff Novella so

that Plaintiff Novella would not sue the Defendants for Priola's unlawful behavior.

216.    Throughout Plaintiff Pace's tenure as an employee for Defendants, the Defendants forced Plaintiff Pace to promote live sex shows for Defendants' company. Plaintiff Pace protested against promoting such shows as he felt it only fueled a hostile work environment, increased his anxiety and contributed to the ongoing sexual harassment.

217.    After enduring unprecedented levels of sexually harassing and abusive behavior, in conjunction with the unlawful actions promoted by the Defendants, Plaintiff Pace reached a breaking point.

218.    On or about August 1, 2016, the Defendants constructively discharged Plaintiff Pace by making his work conditions so unbearable that no reasonable in the Plaintiff's position could have stayed. Due to the consistent and extreme sexual harassment in conjunction with the severe and pervasive hostile work environment, Defendants forced Plaintiff Pace from his job.

219.    Defendants failed to take any action to remedy the ongoing pattern and practice of sexual harassment and discrimination.

220.    As a result of the Defendants actions, Plaintiff has suffered emotional distress.

221.    As the Defendants' conduct has been malicious, willful, outrageous and conducted with the full knowledge of the law, Plaintiff demands punitive damages as against the Defendants.

222.    The above are just some of the examples of unlawful and discriminatory

conduct to which Defendants subjected the Plaintiffs

## AS THE FIRST CAUSE OF ACTION: DISCRIMINATION UNDER TITLE VII
## [AGAINST ALL DEFENDANTS]

223.    Plaintiffs Novella and Pace repeat and reallege every allegation made in

the above paragraphs of this complaint.

224.    Title VII states in relevant part as follows: SEC. 2000e-2. [Section 703]

(a) Employer practices It shall be an unlawful employment practice for an

employer - (1) to fail or refuse to hire or to discharge any individual, or

otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin; . . . . . (k) The

terms 'because of sex' or 'on the basis of sex' include, but are not limited to,

because of or on the basis of pregnancy, childbirth, or related medical

conditions; and women affected by pregnancy, childbirth, or related medical

conditions shall be treated the same for all employment-related purposes,

including receipt of benefits under fringe benefit programs, as other persons

not so affected but similar in their ability or inability to work, and nothing in

section 703(h) of this title shall be interpreted to permit otherwise.

225.    Defendants engaged in unlawful employment practices prohibited by 42

U.S.C. §2000e et seq., by discriminating against Plaintiff because of his sex

34

and Defendants created a hostile work environment and constructively terminated the Plaintiffs.

226.     Plaintiffs make a claim against Defendants under all applicable laws under Title VII.


## AS A SECOND CAUSE OF ACTION: DISCRIMINATION UNDER TITLE VII [AGAINST ALL DEFENDANTS]

227.     Plaintiffs Novella and Pace repeat and reallege every allegation made in the above paragraphs of this complaint.

228.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be an unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because he has      opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

229.     Defendant engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e et seq. by retaliating against Plaintiff with respect to the terms, conditions or privilege of employment because of her opposition to the unlawful employment practices of Defendant.

230.     Plaintiffs make a claim against Defendants under all applicable laws under

Title VII.


**AS A THIRD CAUSE OF ACTION: VICARIOUSLY LIABILITY UNDER
TITLE VII
[AGAINST ALL DEFENDANTS]**

231.     Plaintiff Novella and Pace repeat and reallege every allegation made in the

above paragraphs of this complaint.

232.     At all times relevant Defendant Priola was a supervisor for Defendants.

233.     Defendant Priola was acting within the scope of his employment when he

sexually assaulted and harassed Plaintiff Novella and Plaintiff Pace.

234.     Plaintiffs make a complaint against Defendants for ignoring Defendant

Gonzalez' conduct, making Defendants vicariously liable for Defendant

Gonzalez' actions.


**AS A FOURTH CAUSE OF ACTION: DISCRIMINATION UNDER NEW YORK
STATE LAW**

**[AGAINST ALL DEFENDANTS]**


235.     Plaintiffs Novella and Pace repeat and reallege each and every allegation

made in the above paragraphs of this complaint.

236.     New York State Executive Law § 296 provides that, "1. It shall be an

unlawful discriminatory practice: (a) For an employer or licensing agency,

because of an individual's age, race, creed, color, national origin, sexual

orientation, military status, sex, disability, predisposing genetic

36

characteristics, marital status, or domestic violence victim status, to refuse to

hire or employ or to bar or to discharge from employment such individual or

to discriminate against such individual in compensation or in terms,

conditions or privileges of employment."

237.   Defendants engaged in an unlawful discriminatory practice by

discriminating against the Plaintiffs because of their sex/gender, together with

sexual harassment, causing a hostile work environment and constructive

termination.

238.    Plaintiffs hereby make a claim against Defendants under all of the

applicable paragraphs of New York State Executive Law Section 296.


## AS A FIFTH CAUSE OF ACTION: DISCRIMINATION UNDER NEW YORK STATE LAW

## [AGAINST ALL DEFENDANTS]


239.   Plaintiffs Novella and Pace repeat and reallege each and every allegation

made in the above paragraphs of this complaint.

240.   New York State Executive Law §296(7) provides that it shall be an

unlawful discriminatory practice : "For any person engaged in any activity to

which this section applies to retaliate or discriminate against any person

because he has opposed any practices forbidden under this article."

241.   Defendants engaged in an unlawful discriminatory practice by retaliating

against Plaintiffs with respect to the terms, conditions or privileges of their

employment on the basis of his opposition to the unlawful practices of Defendants.

242.    Plaintiffs make a claim against Defendants under all of the applicable paragraphs of New York State Executive Law Section 296.

## AS A SIXTH CAUSE OF ACTION: DISCRIMINATION UNDER NEW YORK STATE LAW

### [AGAINST ALL DEFENDANTS]

243.    Plaintiffs Novella and Pace repeat and reallege each and every allegation made in the above paragraphs of this complaint.

244.    New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

245.    Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the unlawful, discriminatory, and retaliatory conduct as stated herein.

246.    Plaintiffs make a claim against Defendants under all of the applicable paragraphs of New York State Executive Law Section 296.

## AS A EIGHTH CAUSE OF ACTION: CIVIL LIABILITY FOR CRIMINAL SEXUAL ACTS IN THE FIRST DEGREE UNDER NEW YORK STATE LAW

### [AS AGAINST DEFENDANT PRIOLA]

247.   Plaintiffs Novella and Pace repeat and reallege each and every allegation

made in the above paragraphs of this complaint.

248.   213-c of the Civil Practice Law and Rules provides as follows:

§ 213-c.  Action by victim of conduct constituting certain sexual offenses

" Notwithstanding any other limitation set forth in this article, a civil
claim or cause of action to recover from a defendant for physical,
psychological or other injury or condition suffered by a person as a result
of acts by such defendant of criminal sexual act in the first degree as
defined in section 130.50 of the penal law, may be brought within five
years. As used in this section, the term "defendant" shall mean only a
person who commits the acts described in this section or who, in a
criminal proceeding, could be charged with criminal liability for the
commission of such acts pursuant to section 20.00 of the penal law and
shall not apply to any related civil claim or cause of action arising from
such acts. Nothing in this section shall be construed to require that a
criminal charge be brought or a criminal conviction be obtained as a
condition of bringing a civil cause of action or receiving a civil judgment
pursuant to this section or be construed to require that any of the rules
governing a criminal proceeding be applicable to any such civil action."

249.   Under § 130.5 of the penal code, a person is guilty of criminal sexual acts

in the first degree when he or she engages in anal sexual conduct with another

person by forcible compulsion…. criminal sexual act in the first degree is a

class B felony.

250.   Because Defendant Priola could be held liable for the criminal sexual acts

described in § 130.5 of the penal code, under § 213-c of the CPLR Defendant

Priola is civilly liable to Plaintiffs for his criminal sexual acts.

**AS AN NINTH CAUSE OF ACTION: ASSAULT  UNDER NEW YORK**

**STATE LAW**
**[AGAINST DEFENDANT PRIOLA]**

251.    Plaintiffs Novella and Pace repeat and reallege each and every allegation made in the above paragraphs of this Complaint.

252.    Under New York law, assault is the (i) intentional placing (ii) of another person (iii) in reasonable apprehension (iv) of imminent harmful or offensive contact. See United Nat. Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d. Cir. 1993).

253.    Under New York law, as a result of the assault, a Defendant commits a battery when (i) there was bodily contact, (ii) the contact was offensive and (iii) the defendant intended to make the contact. (New York often uses the term assault interchangeably with battery)

254.    Under the applicable law, Plaintiffs may invoke the doctrines of equitable tolling or equitable estoppel because in the current case, Plaintiff was induced by Defendant Priola to refrain from filing a timely action and Defendant Priola took affirmative steps to conceal his actions against the Plaintiffs and the wrongs itself were of such a nature so as to be self-concealing.

255.    Defendant Priola intentionally placed Plaintiff Novella and Plaintiff Pace in reasonable apprehension of imminent harmful and offensive physical contact as he attempted to make offensive physicical/sexual contact on the Plaintiffs.

256.    Defendant Priola did in fact intentionally make offensive contact with the Plaintiffs by (i) forcing kisses on the plaintiffs; (ii) slapping Plaintiff Novella;

and (ii) aggressively groping the plaintiffs in a forceful and offensive manner.

257.    Defendant Priola committed assault and battery and is liable to the
Plaintiffs for their injuries, for which the Plaintiffs claim damages in an
amount to be determined at trial.

258.    Through intentional displays of violence and threatening gestures
Defendant Priola attempted to inflict injury upon the Plaintiffs.

259.    Plaintiffs make the claim that Defendant Priola assaulted Plaintiffs in
violation of New York State Law.


### AS A FIFTH CAUSE OF ACTION
### FOR NEGLIGENCE-NEGLIGENT
### HIRING/TRAINING/RETENTION/SUPERVISION

258.    Plaintiffs hereby incorporates by reference all preceding paragraphs as if fully set
forth herein.

259.    Defendants owed Plaintiff a legal duty of care. Defendants placed their employees
in a position to cause foreseeable harm which the Plaintiffs would have been spared had
the Defendants taken reasonable care in supervising or retaining their employees.

260.    The Defendants knew or should have known of their employees' propensity for
the discriminatory and unlawful conduct that caused the injury.

261.    But-for the Defendants' breach of duty owed to Plaintiffs, and Plaintiffs'
detrimental reliance thereon, Plaintiff would not have suffered the harm alleged herein.

262.    Defendants were negligent in the hiring, training, supervision and retention of
said employees.

263.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer emotional distress, mental anguish,  and  other damages for which he is entitled to compensatory, equitable and other lawfully available relief in an amount to be proven at trial.


## JURY DEMAND

Plaintiff Novella and Plaintiff Pace request a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff Pace and Plaintiff Novella respectfully request a judgment against the Defendants jointly and severally for all available damages including but not limited to emotional distress, lost wages, back pay, front pay, punitive damages, statutory damages, attorney's fees, costs, interest and all other damages as are just and proper to remedy for Defendants' unlawful employment practices.

Dated: New York, New York

October 20, 20017


DEREK SMITH LAW GROUP, PLLC

By:

_____/s/_____

Paul Liggieri, Esq.

*Attorneys for Plaintiff*

One Penn Plaza, Suite 4905

New York, New York 10119